| | |
|---|---|
| BLOOD HURST & O'REARDON, LLP<br>TIMOTHY G. BLOOD (149343)<br>THOMAS J. O'REARDON II (247952)<br>701 B Street, Suite 1700<br>San Diego, CA  92101<br>Tel: 619/338-1100<br>619/338-1101 (fax)<br>tblood@bholaw.com<br>toreardon@bholaw.com | LANDAY ROBERTS LLP<br>JOHN K. LANDAY (257573)<br>MALCOLM B. ROBERTS (242431)<br>450 J. Street, Unit 5291<br>San Diego, CA  92101<br>Tel: 805/305-3384<br>jlanday@landayroberts.com<br>mroberts@landayroberts.com |

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
KEVIN A. SEELY (199982)
ASHLEY P. PALMER (246602)
LEONID KANDINOV (279650)
600 B Street, Suite 1900
San Diego, CA  92101
Tel: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
apalmer@robbinsarroyo.com
lkandinov@robbinsarroyo.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

| | |
|---|---|
| TY RAYNER, on Behalf of Himself and All Others Similarly Situated,<br><br>  Plaintiff,<br><br>  v.<br><br>E*TRADE FINANCIAL CORPORATION and E*TRADE SECURITIES LLC,<br><br>  Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Case No.

CLASS ACTION COMPLAINT

00082410

Plaintiff Ty Rayner ("Plaintiff") brings this action on behalf of himself and all others similarly situated (the "Class") against defendants E*TRADE Financial Corporation and its order routing unit E*TRADE Securities LLC (together referred to as "E*TRADE" or "Defendants"), and states:

**NATURE OF THE ACTION**

1. This class action lawsuit seeks redress for E*TRADE's breach of its duty of "best execution" when routing a specific type of investment trade for execution on behalf of its customers, known as a "non-directed, standing limit order."[1] E*TRADE is a brokerage firm that executes orders for stock and other investment trades on behalf of its clients. As part of providing trade execution services, it routes trades to trading venues that effectuate the purchase or sale of the equity. E*TRADE selects the trading venues that it wants to execute its customer's trades. Nearly all of the trading venues E*TRADE selects pay E*TRADE kickbacks for sending them trades to execute. As detailed below, E*TRADE's automated, non-discretionary routing policy and practice is to direct customer orders to the trading venues that pay E*TRADE the largest kickbacks rather than the trading venues that will fulfill E*TRADE's duty of best execution. This policy and practice violates E*TRADE's duty of best execution, constituting a breach of E*TRADE's fiduciary duty to the Class. This action seeks to end this practice by foreclosing E*TRADE's consideration of kickbacks in deciding where to send trades and to disgorge the money E*TRADE wrongfully obtained as a result of its breach.

**JURISDICTION AND VENUE**

2. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 Class members and many members of

---

[1] Unless the client specifically instructs otherwise (thereby making it a "directed order" versus the normal "non-directed order"), the broker chooses the particular trading venue. A "limit order" is an order to buy or sell a stock at a specified price (the "limit") or better. There are two basic categories of limit orders: marketable and non-marketable (or "standing") limit orders. A limit order is marketable if it generates a trade when the order arrives at a trading venue. Otherwise, the limit order is a "standing" order and is placed onto the trading venue's limit order book where it will remain until it cancels, expires, or trades.

Case No.
1
CLASS ACTION COMPLAINT

Blood Hurst & O'Reardon, LLP

1 the Class are citizens of states different from E*TRADE. Further, greater than two-thirds of
2 the Class members reside in states other than the states in which Defendants are citizens.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because many of the acts and transactions giving rise to this action occurred in this District and because Defendants:

 (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District;

 (b) do substantial business in this District; and

 (c) are subject to personal jurisdiction in this District.

4. This Court has personal jurisdiction over Defendants because Defendants are entities with sufficient minimum contacts with this District so as to render the Court's exercise of jurisdiction over each of them permissible under traditional notions of fair play and substantial justice.

5. Intradistrict Assignment: Pursuant to Civil Local Rules 3-2(c)-(d), and 3-5(b), Plaintiff resided in Santa Clara County, placed limit orders with E*TRADE while residing in Santa Clara County, this action otherwise arises in Santa Clara County, and it is therefore appropriate to assign this action to the San Jose Division.

## PARTIES

6. Plaintiff Ty Rayner has been a client of E*TRADE since approximately 2006. As recently as January 2014, and while residing in San Jose, California, Plaintiff placed a non-directed, standing limit order with E*TRADE that was subsequently executed, and Plaintiff plans to place such orders in the future. Plaintiff has been and will continue to be subject to E*TRADE's improper practices arising out of the non-directed, standing limit orders he makes. As a result of E*TRADE's improper practices described herein, E*TRADE has breached its fiduciary duties, including the duty of best execution in connection with Plaintiff's non-directed, standing limit orders.

7. Defendant E*TRADE Financial Corporation is a Delaware corporation with principal executive offices located at 1271 Avenue of the Americas, 14th Floor, New York,

1  New York. Defendant E*TRADE Financial Corporation is a financial services company that
2  provides brokerage and related products and services primarily to individual retail investors.
3  Defendant E*TRADE Financial Corporation provides services through its mobile applications
4  and website as well as through a network of customer service representatives and financial
5  consultants over the phone or in person through thirty branches, including eight branches in
6  California.

7        8.    Defendant E*TRADE Securities LLC ("E*TRADE Securities") is Delaware
8  limited liability company and an indirect, wholly-owned subsidiary of defendant E*TRADE
9  Financial Corporation with its main office located at 1271 Avenue of the Americas, 14th
10 Floor, New York, New York. Defendant E*TRADE Securities is a registered broker-dealer,
11 including in California and is the primary provider of brokerage products and services to
12 defendant E*TRADE Financial's Corporation customers, including members of the Class. For
13 non-directed orders, including those at issue in this lawsuit, defendant E*TRADE Securities
14 selects the execution venue on behalf of defendant E*TRADE Financial Corporation's
15 customers.

**BACKGROUND REGARDING THE MAKER-TAKER MODEL**

17       9.    Brokers, such as E*TRADE, have a significant number of venues from which
18 to choose when deciding where to route their client orders for execution. Regardless of the
19 exchange on which a stock is listed, stocks can be traded at a number of different trading
20 venues, such as one of the major exchanges (*e.g.*, New York Stock Exchange ("NYSE"), the
21 NASDAQ Stock Market or Direct Edge ECN, LLC ("Direct Edge")), hedge funds (*e.g.*,
22 Citadel LLC ("Citadel")), banks (*e.g.*, Citigroup Inc. and UBS AG), electronic
23 communications networks, and third-party market makers that hold shares of securities in their
24 own inventory to create a market for both buyers and sellers of those securities. There are
25 approximately thirteen public exchanges, plus over forty additional trading venues.

26      10.    Kickbacks arise under a system referred to as the "maker-taker" model. Under
27 the "maker-taker" arrangement, trading venues pay brokers a "rebate" when brokers send or
28 "make" a standing limit buy or sell order to the trading venue, and charge an access or "taker"

3    Case No.
CLASS ACTION COMPLAINT

fee to the brokers that "take" the order. These "make" order "rebates" are kickbacks. Different trading venues pay kickbacks in differing amounts or none at all. By maximizing maker kickbacks and minimizing taker fees by sending orders to a particular trading venue, brokers can add tens of millions of dollars to their bottom lines.

11. Unlike some brokers, E*TRADE does not pass on these lucrative kickbacks that it receives for routing the orders of Plaintiff and Class members to particular trading venues.

12. Market experts acknowledge that the maker-taker system sets up financial incentives that can cause brokers to act to the detriment of their retail investor clients. In November 2013, RBC Capital Markets Corporation ("RBC Capital Markets") wrote the U.S. Securities and Exchange Commission ("SEC") to explain that "maker/taker pricing has compromised efficiency and liquidity, predominantly by incentivizing some market participants to trade primarily, if not solely, to profit from collecting rebates." RBC Capital Markets also stated: "maker/taker implicates a conflict of interest between brokers and clients. The conflict manifests by incentivizing brokers to use routing that may be most cost-effective for them, but which may not be the best method of execution for their clients."

13. Similarly, BlackRock, Inc., the world's largest money manager, wrote in an April 2014 white paper that "[a]chieving best execution for clients should be the sole objective in order handling practices," but the maker-taker rebate/fee models "significantly influence the order handling and routing practices of broker-dealers … [which], in turn creates a potential conflict of interest for brokers."

14. Jeffrey Sprecher, Chief Executive Officer ("CEO") of Intercontinental Exchange Inc., which now owns the NYSE, has argued for the elimination of the maker-taker payment method: "I don't like the idea that you pay people to trade – I don't think that it should be done…. I don't think it should be legal. It puts wrong incentives in the market."

## E*TRADE'S DUTY OF BEST EXECUTION

15. E*TRADE has a duty of fair dealing, a duty to use reasonable diligence to ascertain the best market, and a duty of best execution in buying and selling stocks, bonds, options, and other assets on behalf of its clients.

16. The duty of best execution predates federal securities laws, and is rooted in common law agency principles of undivided loyalty and reasonable care. In all instances, best execution requires the broker to put the interests of its customers ahead of its own and to use reasonable diligence so that the resultant price to the customer is as favorable as possible.

17. E*TRADE acknowledges that it owes its clients a duty of best execution. For example, on the "Execution Quality Scorecard" section of its website, E*TRADE states:

> At E*TRADE, we know that execution quality is of utmost importance. That's why we do everything possible to seek best execution each and every time you trade. We partner with multiple market centers for end-to-end control over orders in an effort to provide the highest speed and quality of execution. No specific statistic defines a quality execution. Therefore, E*TRADE dedicates a team to regular, rigorous reviews to find the right blend of execution price, speed, and price improvement. 100% of customer options orders are processed using smart order-routing technology to seek the best execution available in the market.

18. When delivering best execution for non-directed, standing limit orders, brokers, including E*TRADE, must take into account any material differences in execution quality (*i.e.*, the likelihood of execution, speed of execution, and price improvement opportunity) among different venues.

19. Delivering best execution is fundamental to market integrity and to the delivery of good outcomes for investors who rely on agents to act in their best interests. Pursuant to best execution, brokers are required to use reasonable diligence to ascertain the best trading venue so that the resultant price to the customer is as favorable as possible. Brokers, such as E*TRADE, are not permitted to allow kickbacks, such as rebate payment inducements, to interfere with their duty of best execution.

20. E*TRADE's duty of best execution does not require individualized, trade by trade determinations where to send each trade for execution. Instead, E*TRADE may properly make best execution determinations for types of trades that permit trade execution

determinations in the aggregate. Nonetheless, E*TRADE's aggregate determination must adhere to its duty of best execution and it is not permitted to put its interests ahead of its clients. Although E*TRADE makes trade execution determinations in the aggregate, it puts its interests ahead of its clients.

## E*TRADE'S CONDUCT

21. E*TRADE acts in derogation of the fiduciary duties owed to its customers by failing to provide best execution for their orders. In breach of its duty of best execution, and in exchange for hundreds of millions of dollars in kickbacks, and in violation of applicable law, E*TRADE directs large blocks of its clients' trade orders to the pre-determined trading venues where E*TRADE will maximize kickback revenue.

22. E*TRADE utilizes a computerized system to direct standing limit order flow to pre-determined trading venues. In accordance with this computerized system, individual customer orders are routed based on an aggregate order-handling policy and practice that has been pre-set for large blocks of trades. E*TRADE's computerized system has the ability to separate market and limit order flow, as well as marketable and standing orders.

23. Reports E*TRADE filed with the SEC further confirm that E*TRADE routes almost all of its clients' orders to only a few trading venues that each pay E*TRADE large kickbacks. For example, in the third quarter of 2014, E*TRADE routed nearly 90% of standing limit orders for NYSE-listed securities to trading venues Direct Edge, Citigroup Global Markets, Inc. ("Citi"), and G1 Execution Services, LLC ("G1 Execution"). Direct Edge and Citi paid E*TRADE the highest rebate kickbacks and G1 Execution was a subsidiary of E*TRADE until it was sold in February 2014:[2]

---

[2] In October 2013, E*TRADE announced that it was selling G1 Execution (formerly known as E*TRADE Capital Markets, LLC) at a nearly $100 million loss just two months after E*TRADE disclosed that regulators were investigating whether E*TRADE's customers received best execution. As part of the sale to Susquehanna International Group LLP ("Susquehanna"), E*TRADE agreed to send 70% of all customer orders to G1 Execution for five years. The $75 million sale of G1 Execution to Susquehanna closed in February 2014.

6    Case No.
CLASS ACTION COMPLAINT

Case5:15-cv-01384   Document1   Filed03/25/15   Page8 of 18

| For quarter ending 9/30/2014 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 49.32% | 68.44% | 28.93% | 79.79% |
| EDGX Exchange, Inc.[2] | 19.17% | 0.00% | 37.82% | 0.00% |
| Citadel Securities, LLC[3] | 12.34% | 17.68% | 8.88% | 6.52% |
| Citigroup Global Markets, Inc.[4] | 11.45% | 0.00% | 22.59% | 0.00% |
| KCG Americas, LLC[5] | 5.58% | 9.54% | 1.16% | 13.22% |
| Total E*TRADE Orders | 96.9% | 41.4% | 50.7% | 7.9% |

24.     Similarly, in the third quarter of 2014, E*TRADE routed over 92% of standing limit orders for NASDAQ-listed securities to trading venues Direct Edge, G1 Execution, and Nasdaq OMX. Once again, Direct Edge and Nasdaq OMX paid E*TRADE the highest rebate kickbacks and G1 Execution, a former subsidiary of E*TRADE, was guaranteed to receive orders pursuant to the terms of its sale by E*TRADE to Susquehanna:

| For quarter ending 6/30/2014 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 48.44% | 70.69% | 27.99% | 84.73% |
| EDGX Exchange, Inc.[2] | 22.61% | 0.00% | 41.33% | 0.00% |
| Nasdaq OMX[3] | 13.54% | 0.00% | 24.65% | 0.67% |
| Citadel Securities, LLC[4] | 7.42% | 14.74% | 3.05% | 2.92% |
| KCG Americas, LLC[5] | 5.89% | 10.35% | 2.10% | 10.97% |
| Total E*TRADE Orders | 96.4% | 37.4% | 54.7% | 7.9% |

25.     Direct Edge, to which E*TRADE routed more of its clients' limit orders than to any other venue in the third quarter of 2014, paid $0.0031 per share in kickbacks – the highest kickback amongst the venues for the NYSE-listed securities and the second highest kickback amongst the venues for the NASDAQ-listed securities.[3] In sharp contrast, E*TRADE did not route a single market order to Direct Edge or Nasdaq OMX, which do not pay maker kickbacks for executing market orders. Instead, E*TRADE routed a substantial majority of its market orders to its former subsidiary, G1 Execution.

---

[3]     Payments received from Nasdaq OMX averaged about $0.0003 per share more than Direct Edge for the NASDAQ-listed securities. Nasdaq OMX's similarly high kickback arrangement with E*TRADE explains why it received nearly a quarter of E*TRADE's clients' limit orders.

7     Case No.
CLASS ACTION COMPLAINT
00082410

BLOOD HURST & O'REARDON, LLP

26. E*TRADE is a recidivist offender of violating its best execution duties concerning its routing of its clients' orders to G1 Execution and has been fined before. In fact, in 2012, Kenneth Griffin, former E*TRADE board member and CEO of hedge-fund Citadel (which at that time owned almost 10% of E*TRADE's stock) questioned whether E*TRADE's order routing practices were complying with its duty of best execution.

27. In the second quarter of 2014, Direct Edge, Citi, and G1 Execution received nearly 95% of E*TRADE's total limit orders for NYSE-listed securities and nearly 94% of E*TRADE's total limit orders for NASDAQ-listed securities. Direct Edge received more of E*TRADE's clients' limit orders than any other venue in the second quarter, but none of E*TRADE's market orders because Direct Edge pays kickbacks for limit orders, but not market orders. Rather, similar to the third quarter of 2014, E*TRADE routed a substantial majority of its market orders to G1 Execution:

**1. New York Stock Exchange Listed Securities**

| For quarter ending 6/30/2014 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 51.18% | 71.12% | 31.21% | 72.86% |
| EDGX Exchange, Inc.[2] | 19.64% | 0.00% | 39.01% | 0.00% |
| Citigroup Global Markets, Inc.[3] | 13.52% | 0.00% | 24.69% | 13.00% |
| Citadel Securities, LLC[4] | 7.89% | 14.96% | 2.95% | 2.76% |
| KCG Americas, LLC[5] | 5.97% | 10.30% | 1.59% | 10.96% |
| Total E*TRADE Orders | 97.3% | 41.3% | 50.3% | 8.4% |

### 2. NASDAQ Stock Market Listed Securities

| For quarter ending 6/30/2014 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 48.44% | 70.69% | 27.99% | 84.73% |
| EDGX Exchange, Inc.[2] | 22.61% | 0.00% | 41.33% | 0.00% |
| Nasdaq OMX[3] | 13.54% | 0.00% | 24.65% | 0.67% |
| Citadel Securities, LLC[4] | 7.42% | 14.74% | 3.05% | 2.92% |
| KCG Americas, LLC[5] | 5.89% | 10.35% | 2.10% | 10.97% |
| Total E*TRADE Orders | 96.4% | 37.4% | 54.7% | 7.9% |

28. In the first quarter of 2014, Direct Edge, Citi, and G1 Execution received nearly 95% of E*TRADE's total limit orders for NYSE-listed securities and nearly 92% of E*TRADE's total limit orders for NASDAQ-listed securities. Direct Edge received more of E*TRADE's clients' limit orders than any other venue in the first quarter, but none of E*TRADE's market orders because Direct Edge pays kickbacks for limit orders, but not market orders. Rather, E*TRADE again routed a substantial majority of its market orders to G1 Execution:

### 1. New York Stock Exchange Listed Securities

| For quarter ending 3/31/2014 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 48.08% | 69.55% | 30.62% | 47.30% |
| EDGX Exchange, Inc.[2] | 19.24% | 0.00% | 38.21% | 0.00% |
| Citigroup Global Markets, Inc.[3] | 17.71% | 3.24% | 25.86% | 39.90% |
| KCG Americas, LLC[4] | 6.81% | 11.13% | 2.53% | 11.21% |
| Citadel Securities, LLC[5] | 5.79% | 11.24% | 2.10% | 1.12% |
| Total E*TRADE Orders | 97.4% | 41.3% | 50.3% | 8.4% |

## 2. NASDAQ Stock Market Listed Securities

| For quarter ending 3/31/2014 | Non-Directed Orders | Market Orders | Limit Orders | Other Orders |
|---|---|---|---|---|
| Orders Routed to: | | | | |
| G1 Execution Services, LLC[1] | 49.06% | 69.80% | 27.51% | 90.97% |
| EDGX Exchange, Inc.[2] | 21.76% | 0.00% | 40.76% | 0.00% |
| Nasdaq OMX[3] | 12.69% | 0.00% | 23.69% | 0.56% |
| KCG Americas, LLC[4] | 7.01% | 11.14% | 4.20% | 6.22% |
| Citadel Securities, LLC[5] | 5.47% | 11.07% | 2.19% | 1.12% |
| Total E*TRADE Orders | 96.3% | 37.9% | 53.4% | 8.7% |

29. Likewise, in the second, third, and fourth quarters of 2013, these same three firms paid kickbacks to E*TRADE to receive between 74% and 81% of all limit orders for NYSE-listed securities, and as much as 80% of its NASDAQ-listed securities.[4] Similar to the first three quarters of 2014, Direct Edge did not receive any of E*TRADE's market orders, but it did receive approximately 30% of E*TRADE's limit orders during this time.

30. E*TRADE has made significant profits from its improper order routing practices. In 2012 and 2013, E*TRADE earned nearly **$131 million** from the payments that it received from third-party trading venues. Notably, these amounts are in addition to the commissions paid by E*TRADE's clients for its retail brokerage services.

31. Studies conducted by Professors Robert H. Battalio, Shane A. Corwin, and Robert Jennings from the Mendoza College of Business at the University of Notre Dame and the Kelley School of Business at Indiana University (the "Battalio Research"), into the order routing practices of E*TRADE and other brokers, provides further evidence that non-directed, standing limit order routing decisions made pursuant to kickback arrangements typically provide inferior execution relative to other trading venues. The Battalio Research found that "[f]our sample brokers, Ameritrade, E*Trade, Fidelity, and Scottrade, route orders in a way that suggests a focus on liquidity rebates." Consistent with the Battalio Research, limit orders routed to the trading venues offering higher kickbacks fill slower and less often than similar orders routed to trading venues offering lower kickbacks. When brokers like E*TRADE

---

[4]  Plaintiff does not have access to E*TRADE's first quarter of 2013 606 Report.

implemented programs designed to maximize their own profits through maximizing kickbacks, client orders were routed to venues where the orders were up to 25% less likely to be executed.

32. There is a high correlation between the level of a trading venue's taker fee and its maker rebate. Thus, a trading venue such as Direct Edge, which offers a high kickback in the form of a rebate, also charges a high taker fee. The Battalio Research found that when identical orders were routed to two venues at the same time, the venue offering lower kickbacks was more likely to fill the limit order, and – in instances where both venues filled the order – was far more likely to fill the order more quickly.

33. Further, the Battalio Research analyzed market order execution across multiple venues when each of the venues was at the best price. The Battalio Research found that the data supported previous academic work finding that fees influenced the routing of orders to venues charging the lowest taker fee (*i.e.*, venues unlike Direct Edge). In such instances, the limit order queue line for the venues offering the highest taker fee (and correspondingly, the highest kickback) was two to three times as long as the queue line for the venues charging the lowest taker fee and offering the lowest kickback. This explains why limit orders routed to the trading venues paying the highest kickbacks take longer to be filled than limit orders routed to the trading venues paying the lowest kickbacks. According to Professor Battalio, "the decision to route all limit orders to a single venue paying the maximum rebate, (and, correspondingly charging the maximum take fee), is inconsistent with a broker's responsibility to obtain best execution."

34. Finally, as reiterated in his written Senate testimony, Professor Battalio and his co-authors also concluded that limit orders sent to the trading venues with the highest taker fees (*i.e.*, Direct Edge) will have lower fill rates and trade when the market price is becoming worse for the customer:

> All else equal, when two venues offer the best price, one expects liquidity demanders arriving in the marketplace to first route their orders to the venue with the lower take fee. Consider the case where two exchanges are at the national best bid. If sufficient selling demand arrives, sellers exhaust liquidity by walking down both exchange's limit order books. In this situation, limit order traders who purchase shares at the bid price suffer a short-term loss. However, if the stock price rises before liquidity is exhausted at the national best bid, limit orders on the venue with the higher take fee (and thus, the higher

make rebate) can become isolated and miss profitable trading opportunities. Thus, on average, we expect that limit orders sent to venues with high take fees will have lower fill rates and suffer greater adverse selection costs – they are more likely to trade when the price moves against them and less likely to trade when prices move in their favor. This suggests that brokers routing limit orders to venues with the highest take fees (and make rebates) may not be obtaining best execution for their clients.

35. The Battalio Research demonstrates an impact of limit order routing decisions on limit order execution quality, such that "routing decisions based primarily on rebates/fees appear to be inconsistent with best execution."

36. This action does not contend that maker kickbacks are per se unlawful or improper or that compensation for a maker rebate for a particular trade means the broker receiving the rebate violated best execution. This action also does not challenge E*TRADE's disclosure of maker kickbacks.

## CLASS ACTION ALLEGATIONS

37. Plaintiff brings this case as a class action pursuant to Rules 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure. The proposed Class consists of all persons who placed a non-directed, standing limit order with E*TRADE that was executed until the date notice is disseminated to the Class.

38. The Class excludes E*TRADE's officers and directors, current or former employees, as well as their immediate family members.

39. ***Numerosity.*** The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains thousands of members. While the precise number of Class members is unknown to Plaintiff, it is known to Defendants.

40. ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. All members of the Class have been subject to the same conduct and their claims arise from the same legal claims. The common legal and factual questions include, but are not limited to, the following:

(a) whether E*TRADE has a duty of best execution to Plaintiff and members of the Class;

(b) whether E*TRADE has an obligation to obtain the most favorable terms reasonably available for the non-directed, standing limit orders placed by Plaintiff and members of the Class;

(c) whether E*TRADE has a policy or practice of receiving kickbacks in connection with placing the non-directed, standing limit orders made by Plaintiff and members of the Class;

(d) whether E*TRADE's policy or practice of choosing trading venues based on the kickbacks it would receive for the non-directed, standing limit orders made by Plaintiff and members of the Class breached the duty of best execution owed to Plaintiff and members of the Class;

(e) whether E*TRADE engaged in unlawful or unfair business practices;

(f) whether the Plaintiff and the Class are entitled to injunctive relief;

(g) whether the Plaintiff and the Class are entitled to declaratory relief;

(h) whether E*TRADE has been unjustly enriched by its improper course action;

(i) whether the commissions and kickbacks in the form of rebates, received by E*TRADE in connection with the non-directed, standing limit orders made by Plaintiff and the Class should be disgorged; and

(j) whether Plaintiff and members of the Class are entitled to equitable relief, and the proper measure of that equitable relief.

41. ***Typicality.*** Plaintiff's claims are typical of the claims of the members of the Class in that Plaintiff is a member of the Class that **he/she** seeks to represent.

42. ***Adequacy of Representation.*** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in the prosecution of this type of class action litigation. Plaintiff has no adverse or antagonistic interests to those of the Class.

43. *Superiority*. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it impracticable or impossible for Class members to prosecute their claims individually. Further, the adjudication of this action presents no unusual management difficulties.

44. Unless a class is certified, Defendants will retain monies received as a result of its improper conduct. Unless a classwide injunction is issued, Defendants will continue to commit the violations alleged, and will continue to violate its duties of best execution in connection with orders placed by members of the Class. E*TRADE has acted or refused to act on grounds that are generally applicable to the Class so that injunctive and declaratory relief is appropriate to the Class as a whole.

## COUNT I

### Breach of Fiduciary Duty

45. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

46. E*TRADE owed fiduciary duties to Plaintiff and the Class, including duties of best execution.

47. Pursuant to its duty of best execution, E*TRADE was required to take into account material differences in execution quality among trading venues, including using reasonable diligence to ascertain the best trading venue so that the resultant price to Plaintiff and the Class is as favorable as possible. By utilizing the order routing policies and practices described above, which included routing its customers' trades to the trading venues that paid E*TRADE kickbacks, E*TRADE breached its fiduciary duty owed to Plaintiff and the Class.

48. E*TRADE has earned significant, wrongful monies and profits from these material and opportunistic breaches that have also caused the orders made by Plaintiff and the

Class to be executed in a manner that did not fulfill best execution.  E*TRADE's customers have been damaged thereby, in an amount to be determined at trial.

49. As a result of E*TRADE's breach of fiduciary duty, Plaintiff and the Class are also entitled to an accounting and injunctive relief prohibiting E*TRADE from factoring kickbacks when performing best execution for non-directed, standing limit orders.

## COUNT II

### Unjust Enrichment

50. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

51. E*TRADE owes a duty of best execution to Plaintiff and the Class. Notwithstanding its duties, E*TRADE utilizes a uniform trade routing practice that is not in the best interest of its customers.  E*TRADE accepts trade commissions from Plaintiff and the Class for their orders, and thereby assumes a duty of best execution.  In derogation of its duties, E*TRADE routes its customers' orders to the trading venue that is willing to pay E*TRADE the most money to receive its non-directed, standing limit order flow.

52. As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, E*TRADE has profited and benefited from its improper market selection and order routing practices.  E*TRADE does not pass on the rebate payments that it receives for routing the orders of Plaintiff and Class members to particular trading venues.

53. By its improper and wrongful conduct described herein, E*TRADE was and continues to be unjustly enriched at the expense of Plaintiff and the members of the Class.

54. It would be inequitable for E*TRADE to retain the profits, benefits, and other compensation it obtained through its wrongful acts, including the commissions and kickbacks obtained in connection with routing the orders at issue.  Thus, a constructive trust should be imposed on all monies wrongfully obtained by E*TRADE.  Plaintiff and the Class are entitled in equity to seek restitution of these wrongful profits, revenues, and benefits to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy E*TRADE's unjust enrichment.

## COUNT III

### Declaratory Relief

55. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

56. A controversy has arisen and now exists between Plaintiff and Class members on the one hand and E*TRADE on the other. The controversy between the parties concerns E*TRADE's automated trade-routing policy and practice and its duty of best execution owed in connection with the trade orders it routes on behalf of Plaintiff and the Class. Plaintiff and Class members contend that by pre-determining where it will automatically route non-directed, standing limit orders in the aggregate based on maximizing the rebate payments it will receive, E*TRADE violates its duty of best execution, including because it fails to use reasonable diligence to ascertain the best trading venue so that the resultant price to the customer is as favorable as possible. E*TRADE disputes these contentions and contends that it does not violate its duty of best execution by taking into account potential for rebate payments when routing its customers' orders.

57. Plaintiff requests a judicial determination of his rights and duties, and the rights and duties of absent Class members and a declaration as to whether E*TRADE's order routing practice breaches the duty of best execution owed to Plaintiff and Class members.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief in interim orders and by way of entry of final judgment in his favor, in favor of those he seeks to represent, and against Defendants:

A. Certifying this action as a class action and appointing Plaintiff as class representative and his counsel as class counsel;

B. Awarding declaratory and injunctive relief as permitted by law or equity, including a judicial determination of the parties' rights and duties, enjoining E*TRADE from continuing the unlawful practices as set forth herein (including the improper order routing practices), imposing a constructive trust on all monies wrongfully obtained by E*TRADE, and directing E*TRADE to identify, with Court supervision, victims of its conduct and pay them

BLOOD HURST & O'REARDON, LLP

1 restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

      C.     Awarding attorney's fees and costs; and

      D.     Granting Plaintiff and the Class such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: March 25, 2015

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)

By: *s/ Timothy G. Blood*
         TIMOTHY G. BLOOD

701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
KEVIN A. SEELY (199982)
ASHLEY P. PALMER (246602)
LEONID KANDINOV (279650)
600 B Street, Suite 1900
San Diego, CA 92101
Tel: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
kseely@robbinsarroyo.com
apalmer@robbinsarroyo.com
lkandinov@robbinsarroyo.com

LANDAY ROBERTS LLP
JOHN K. LANDAY (257573)
MALCOLM B. ROBERTS (242431)
450 J. Street, Unit 5291
San Diego, CA 92101
Tel: 805/305-3384
jlanday@landayroberts.com
mroberts@landayroberts.com

*Attorneys for Plaintiff*